**DiCELLO LEVITT LLP**
Brian O. O'Mara (229737)
Steven M. Jodlowski (239074)
4747 Executive Drive, Suite 240
San Diego, CA 92121
Tel.: (312) 214-7900
briano@dicellolevitt.com
stevenj@dicellolevitt.com

Amy E. Keller (IL-6296902, MI-P74015 *pro hac vice* forthcoming)
Nada Djordjevic (IL-6277380 *pro hac vice* forthcoming)
Madeline Hills (IL-6345829, MO-76029, WI-1122794 *pro hac vice* forthcoming)
Ten North Dearborn St., Sixth Floor
Chicago, Illinois 60602
Tel.: (312) 214-7900
akeller@dicellolevitt.com
ndjordjevic@dicellolevitt.com

Corban S. Rhodes (NY-4559183 *pro hac vice* forthcoming)
485 Lexington Ave, Suite 1001
New York, NY 10017
Tel.: (312) 214-7900
crhodes@dicellolevitt.com

*Counsel for Plaintiffs and
the Proposed Class*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| A.C. and C.C., minors, by and through their parent ANDREW COOK, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>POWERSCHOOL HOLDINGS, INC. and POWERSCHOOL GROUP LLC,<br><br>Defendants. | Case No.: **'25CV0501 AJB DEB**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT
-1-

Plaintiffs A.C. and C.C. (collectively, "Plaintiffs"), minors, by their parent Andrew Cook, individually and on behalf of all others similarly situated, bring this class action complaint against Defendants PowerSchool Holdings, Inc. and PowerSchool Group LLC (collectively, "PowerSchool" or "Defendants"), and allege as follows:

## INTRODUCTION

1.     This is a data breach class action against PowerSchool for its failure to adequately secure and safeguard the personally identifiable information ("PII") and protected health information ("PHI") (collectively, "Private Information") of millions of students, parents, and school faculty in the United States.

2.     PowerSchool is the largest provider of cloud-based education software for K-12 education in the United States, serving more than 75% of students in North America. PowerSchool's software is used by over 16,000 customers to support more than 60 million students in the United States. PowerSchool offers a full range of services to help school districts operate, including platforms for enrollment, communication, attendance, staff management, learning systems, analytics, and finance.

3.     Due to the nature of its business, PowerSchool receives and maintains Private Information for millions of students, parents, and school faculty across the country. Under both state and federal law, PowerSchool had a duty to protect the Private Information of current and former students and school faculty members. It likewise had a duty to alert the students, parents, and school faculty that their Private Information was accessed by an unauthorized third party and which information was at issue.

4.     Despite holding the highly sensitive Personal Information of millions of people—many of whom are minors—PowerSchool neglected to adequately secure it. Unbeknownst to its customers or the end users, PowerSchool stored Private

Information in unencrypted formats on an Internet-accessible environment, vulnerable to exploitation.

5.    On December 28, 2024, PowerSchool discovered that a cybercriminal had accessed and downloaded millions of records from its Student Information System ("SIS") database, which contained PII and PHI of students, parents, and school faculty from customers worldwide. The cybercriminal exploited the user account of a PowerSchool technical support employee, allowing rapid access to the data between December 19 and December 24, 2024. PowerSchool did not detect the activity until December 28, 2024.

6.    The information exposed or otherwise accessed by the unauthorized third party in the Data Breach included Plaintiffs' and the Class Members' names and addresses, and, upon information and belief, private student and educational information, medical information, and Social Security numbers. Collectively, the information described in this paragraph shall be referred to as "PII" (Personally Identifiable Information) or "Private Information" throughout this Complaint.

7.    Upon learning of the suspected Data Breach on or about December 28, 2024, PowerSchool conducted an investigation. PowerSchool, so far, has yet to inform affected individuals if the investigation was completed or the complete extent of the Data Breach.

8.    On or about January 10, 2025, Mr. Cook received notice of the Data Breach from his children's educational institutions, which had contracted with PowerSchool to provide software services. The notice informed him that his minor children's Private Information had been improperly exposed to unauthorized parties by PowerSchool on or about December 22, 2024.

9.    Mr. Cook brings this class action lawsuit on behalf of his minor children and those similarly situated to address PowerSchool's inadequate safeguarding of Plaintiffs' and Class Members' Private Information that it collected and maintained, and for failing to provide adequate notice to Plaintiffs and other Class Members that

their Private Information had been subject to the unauthorized access of an unknown, unauthorized party.

10.    PowerSchool maintained the Private Information in a reckless and negligent manner. In particular, the Private Information was maintained on PowerSchool's computer system and network in a condition vulnerable to cyberattacks.  Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to PowerSchool and thus PowerSchool was on notice that failing to take steps necessary to secure the Private Information from those risks left that information in a dangerous condition.

11.    Plaintiffs' father and Class Members had no idea their Private Information had been compromised, and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm.

12.    Accordingly, Plaintiffs bring this class action lawsuit on behalf of those similarly situated to address PowerSchool's inadequate safeguarding of Plaintiffs' and Class Members' Private Information that it collected and maintained, and for failing to provide adequate notice to Plaintiffs and other Class Members that their Private Information had been subject to the unauthorized access of an unknown, unauthorized party.  PowerSchool's conduct amounts to negligence and violates federal and state statutes.

13.    Plaintiffs and Class Members have suffered injuries because of PowerSchool's conduct. These injuries are particularly pronounced because the data breach impacted minors, who have yet to establish credit histories, and thus are particularly vulnerable to fraud and identity theft.  These injuries include: (i) the lost value of their Private Information, as it was shared and used in a way that was not authorized; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private

Information; (iii) the continued and exacerbated risk to themselves due to the exposure of their Private Information; and (iv) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for Plaintiffs and the Class. Because many Class Members are still minor children, they face actual and imminent risk of harm that extends into the future beyond the age of majority.

14.    Plaintiffs and Class Members have a continuing interest in ensuring that their Private Information, which, upon information and belief, remains backed up in PowerSchool's possession, is protected, and safeguarded from future breaches.

15.    By this Complaint, Plaintiffs' father seek to remedy these harms on behalf of his minor children and all similarly situated individuals whose Private Information was accessed during the Data Breach. Plaintiffs seek damages, restitution, and injunctive relief, including improvements to PowerSchool's data security systems and integrated services, future annual audits, and adequate credit monitoring services.

## **PARTIES**

16.    Andrew Cook is, and at all times mentioned herein, was an individual citizen residing in Ohio. His minor children, the Plaintiffs in this action, are also citizens and residents of the State of Ohio, and attend a school that uses PowerSchool products. As a result, PowerSchool maintains his minor children's information.

17.    Defendant PowerSchool Holdings, Inc. is a corporation registered in the State of Delaware and maintains its principal place of business at 150 Parkshore Drive, Folsom, California 95630.

18.    Defendant PowerSchool Group LLC is a limited liability company registered in the State of Delaware and maintains its principal place of business at 150 Parkshore Drive, Folsom, California 95630.

## **JURISDICTION AND VENUE**

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which some members of the Class are citizens of a different state than Defendants.

20.     This Court has personal jurisdiction over Defendants as they conduct substantial business and have minimum contacts with the State of California and this district.

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendants are headquartered in California and conduct business in this jurisdiction.

## FACTUAL ALLEGATIONS

### A. *Background on PowerSchool*

22.     PowerSchool is the largest provider of cloud-based education software for K-12 education in the U.S., serving more than 75% of students in North America. PowerSchool's software is used by over 16,000 customers to support more than 60 million students in the United States.[1] PowerSchool offers a full range of services to help school districts operate, including platforms for enrollment, communication, attendance, staff management, learning systems, analytics, and finance.

23.     Due to the nature of its business, PowerSchool receives and maintains PII and PHI for millions of students, parents, and school faculty across the country. Under state and federal law, PowerSchool had a duty to protect the PII and PHI of current and former students and school faculty members, including under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, and the California Consumer Protection Act of 2018 (the "CCPA"), Cal. Civ. Code § 1798, et seq. It likewise had a duty to alert the students, parents, and school faculty that their PII and PHI was accessed by an unauthorized third party and which PII and PHI was at issue.

---

[1] *Bain Capital Completes Acquisition of PowerSchool,* PowerSchool (Oct. 1, 2024), available at https://www.powerschool.com/bain-capital (last accessed Feb. 20, 2025).

B. *Representations by PowerSchool*

24.     PowerSchool has multiple webpages designed to reassure students and parents about Defendants' privacy and cybersecurity practices. PowerSchool represents that they place "great importance and value on the proper handling of personal data that flows within [their] products as [they] provide services to [their] customers."[2]

25.     PowerSchool also claims to have signed the national Student Privacy Pledge that states: "School service providers take responsibility to both support the effective use of student information and safeguard student privacy and information security."[3]

26.     PowerSchool's privacy policy also states that it "seeks to protect our customers' personal data from unauthorized access, use, modification, disclosure, loss, or theft by leveraging various reasonable security measures and methods to secure our customers' personal data throughout its processing lifecycle with PowerSchool applications. Our overall aim is to ensure the confidentiality, integrity, and availability of our customers' personal data by leveraging technical, organizational, and where appropriate, physical security methods. Security protection at PowerSchool is a cross-functional activity that intersects our workforce duties, and we have relevant security and privacy policies to drive expectations from the workforce."

C. *The Data Breach*

27.     On December 28, 2024, PowerSchool discovered that a cybercriminal had accessed and downloaded millions of records from its Student Information

---

[2] *Privacy*, PowerSchool, https://www.powerschool.com/privacy/ (last accessed Feb. 20, 2025).

[3] *K-12 School Service Provider Pledge to Safeguard Student Privacy 2020*, Student Privacy Pledge, https://studentprivacypledge.org/privacy-pledge-2-0/ (last accessed Feb. 20, 2025).

System ("SIS") database, which contained PII and PHI of students, parents, and school faculty from customers worldwide. The cybercriminal exploited the user account of a PowerSchool technical support employee, allowing rapid access to the data between December 19 and December 24, 2024. PowerSchool did not detect the activity until December 28, 2024.

28.    The information exposed or otherwise accessed by the unauthorized third party in the Data Breach included Plaintiffs' and the Class Members' names and addresses, and, upon information and belief, private student and educational information, medical information, and Social Security numbers. Collectively, the information described in this paragraph shall be referred to as "PII" (Personally Identifiable Information) or "Private Information" throughout this Complaint.

29.    Upon learning of the suspected Data Breach on or about December 28, 2024, PowerSchool conducted an investigation. PowerSchool, so far, has yet to inform affected individuals if the investigation was completed or the complete extent of the Data Breach.

30.    On January 8, 2025, Mr. Cook received notice of the Data Breach from his children's respective educational institutions, which had contracted with PowerSchool to provide software services. The notice informed Mr. Cook that his minor children's Private Information had been improperly exposed to unauthorized parties by PowerSchool between December 19, 2024, and December 24, 2024.

31.    The notice also stated that PowerSchool had paid a ransom to the cybercriminal and received "reasonable assurances" that the data was deleted and no additional copies exist. However, PowerSchool did not disclose the amount of the ransom, the identity of the cybercriminal, or the nature of the "reasonable assurances."

32.    The Federal Bureau of Investigation advises companies that are the victim of ransomware not to make ransom payments, as cybercriminals cannot be trusted to destroy the data taken in any data breach.

33.    The notice further stated that PowerSchool had engaged a third-party cybersecurity firm, CrowdStrike, to investigate the breach and that PowerSchool had implemented additional information security best practices, such as requiring updated credentials for all employees and restricting access to their support system tools.

34.    The notice also offered affected individuals one year of free credit monitoring and identity protection services through Experian IdentityWorks.

### D. *Companies Like PowerSchool Are Particularly Susceptible to Cyberattacks*

35.    Defendants were or should have been on notice that data breaches perpetuated against entities that collect, store, and maintain PII and PHI, like Defendants, have become widespread.

36.    The number of U.S. data breaches surpassed 1,000 in 2016, a forty percent increase in the number of data breaches from the previous year.[4] In 2022, 1,802 data compromises were reported that impacted over 422 million victims—marking a 42% increase in the number of victims impacted since 2021.[5] That upward trend continues.

37.    In the first quarter of the 2024 fiscal year alone, 841 organizations experienced data breaches, resulting in 28,596,892 individuals' personal information being compromised.[6]

---

[4] CyberScout & Identity Theft Res. Ctr., *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout*, PR Newswire (Jan. 19, 2017), https://www.prnewswire.com/news-releases/data-breaches-increase-40-percent-in-2016-finds-new-report-from-identity-theft-resource-center-and-cyberscout-300393208.html (last accessed Feb. 20, 2025).

[5] Identity Theft Res. Ctr., 2022 Annual Data Breach Report (Jan. 2023).

[6] *See* Identity Theft Res. Ctr., *Identity Theft Resource Center Q1 2024 Data Breach Analysis: Compromises Up 90 Percent Over Q1 2023* (Apr. 10, 2024).

38.    As the number of data breaches has increased, so has the rate of identity theft complaints. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 6.1 million people in 2021.[7]

39.    Data thieves regularly target companies like Defendants due to the highly sensitive information that they keep in their custody. Defendants knew and understood that unprotected PII and PHI is valuable and highly sought after by criminals who seek to illegally monetize that PII and PHI through unauthorized access, sale and use of the PII and PHI.

40.    Cyber-attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation  and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack.[8]

41.    In April 2020, ZDNet reported, in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year," that "*[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies*. They breach networks, use specialized tools to maximize damage, *leak corporate information on dark web portals*, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[9]

_____

[7] Ins. Info. Inst., Facts + Statistics: Identity Theft and Cybercrime, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (last accessed Feb. 20, 2025).

[8] *See* Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, Law360 (Nov. 18, 2019), https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-a0l55a8bb5l&utm (last accessed Feb. 20, 2025).

[9] ZDNet, Ransomware mentioned in 1,000+ SEC filings over the past year (Apr. 30, 2020) (emphasis added), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/ (last accessed Feb. 20, 2025).

42.    In September 2020, the United States Cybersecurity & Infrastructure Security Agency ("CISA") published online a "Ransomware Guide" advising that "[o]ver time, malicious actors have adjusted their ransomware tactics to be more destructive and impactful and have also exfiltrated victim data and pressured victims to pay by threatening to release the stolen data. The application of both tactics is known as 'double extortion.' In some cases, malicious actors may exfiltrate data and threaten to release it as their sole form of extortion without employing ransomware."[10]

43.    Defendants knew and understood unprotected or exposed PII and PHI in the custody of companies like Defendants, is valuable and highly sought after by nefarious third parties seeking to illegally monetize that PII and PHI through unauthorized access.

44.    Defendants knew, or should have known, the importance of safeguarding PII and PHI entrusted to it by Plaintiffs and Class members, and of the foreseeable consequences if their data security systems were breached. This includes the significant costs imposed on Plaintiffs and Class members as a result of a breach. Defendants failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

**E.    _PowerSchool Could and Should have Prevented the Breach_**

45.    Defendants' cybersecurity practices and policies were inadequate and fell short of the industry-standard measures that should have been implemented long before the Data Breach occurred.

46.    This was known and obvious to Defendants as Defendants observed frequent public announcements of data breaches affecting companies that, like Defendants, collected and maintained significant amounts of personal information,

---

[10] CISA, _#StopRansomware Guide_, https://www.cisa.gov/stopransomware/ransomware-guide (last accessed Feb. 20, 2025).

including PII and PHI, and knew that information of the type they collected, maintained, and stored is highly coveted and a frequent target of hackers.

47.     It is well known that use of stolen credentials has long been the most popular and effective method of gaining authorized access to a company's internal networks and that companies should activate defenses to prevent such attacks.

48.     According to the FBI, phishing schemes designed to induce individuals to reveal personal information, such as network passwords, were the most common type of cybercrime in 2020, with such incidents nearly doubling in frequency between 2019 and 2020.[11]

49.     There are two primary ways to mitigate the risk of stolen credentials: user education and technical security barriers.

50.     User education is the process of making employees or other users of a network aware of common disclosure schemes and implementing company-wide policies requiring the request or transfer of sensitive personal or financial information only through secure sources to known recipients.

51.     Companies can also greatly reduce the flow of fraudulent e-mails by installing technical security barriers including software that scans all incoming messages for harmful attachments or malicious content and implementing certain security measures governing e-mail transmissions, including Sender Policy Framework (SPF) (e-mail authentication method used to prevent spammers from sending messages on behalf of a company's domain), DomainKeys Identified Mail (DKIM) (e-mail authentication method used to ensure messages are not altered in transit between the sending and recipient servers), and Domain-based Message Authentication, Reporting and Conformance (DMARC), which "builds on the widely deployed [SPF] and [DKIM] protocols, adding a reporting function that allows

---

[11] Fed. Bureau Investigation, 2020 Internet Crime Report, https://www.ic3.gov/Media/PDF/AnnualReport/2020_IC3Report.pdf (last accessed Feb. 20, 2025).

senders and receivers to improve and monitor protection of the domain from fraudulent email."[12]

52.    CISA recommends that organizations take the following measures to detect cyber-attacks and prevent unauthorized access:

    a.    Mitigating the risk of stolen credentials;

    b.    Conducting regular vulnerability scanning to identify and address vulnerabilities, particularly on internet-facing devices;

    c.    Regularly patching and updating software to latest available versions, prioritizing timely patching of internet-facing servers and software processing internet data;

    d.    Ensuring devices are properly configured and that security features are enabled;

    e.    Employing best practices for use of Remote Desktop Protocol (RDP) as threat actors often gain initial access to a network through exposed and poorly secured remote services; and

    f.    Disabling operating system network file sharing protocol known as Server Message Block (SMB) which is used by threat actors to travel through a network to spread malware or access sensitive data.[13]

53.    The CISA guidance further recommends use of a centrally managed antivirus software utilizing automatic updates that will protect all devices connected to a network (as opposed to requiring separate software on each individual device), as well as implementing a real-time intrusion detection system that will detect potentially malicious network activity that occurs prior to ransomware deployment.[14]

---

[12] CISA, *#StopRansomware Guide*, https://www.cisa.gov/stopransomware/ransomware-guide (last accessed Feb. 20, 2025).

[13] *Id*.

[14] *Id*.

54.     Defendants, like any entity storing valuable data, should have had robust protections in place to detect and terminate a successful intrusion long before access and exfiltration could expand to millions of consumer files. Defendants' procedures and policies were below industry-standards and are inexcusable given Defendants' knowledge that they were a prime target for cyberattacks.

**F. _Defendants Failed to Comply with FTC Guidelines_**

55.     The Federal Trade Commission ("FTC") has issued numerous guides for business highlighting the importance of reasonable data security practices, which should be factored into all business-related decision making.[15]

56.      Defendants were prohibited by the FTC Act from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.[16]

57.     According to the FTC, the need for data security should be factored into all business decision-making.[17]

58.     FTC guidance to companies like PowerSchool for the use of cloud services includes the following: (1) take advantage of the security features offered by cloud service companies; (2) take regular inventories of what you keep in the cloud; (3) do not store personal information when it is not necessary; (4) consider encrypting

---

[15] Fed. Trade Comm'n, _Start with Security_, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last accessed Feb. 20, 2025).

[16] _See, e.g._, _In re Cap. One Consumer Data Sec. Breach Litig._, 488 F. Supp. 3d 374, 407 (E.D. Va. 2020) (citing _FTC v. Wyndham Worldwide Corp._, 799 F.3d 236 (3d Cir. 2015)).

[17] Fed. Trade Comm'n, _Start With Security: A Guide for Business_, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last accessed Feb. 20, 2025).

rarely used data; (5) pay attention to credible warnings; (6) security is your responsibility.[18]

59.    In 2016, the FTC updated their publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses.[19] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

60.    The FTC further recommends that companies not maintain PII and PHI longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[20] This is consistent with guidance provided by the FBI, HHS, and the principles set forth in the CISA 2020 guidance.

61.    The FTC also states that outdated software undermines security, and recommends that software be updated regularly, third party patches be implemented

---

[18] Elisa Jillson & Andy Hasty, Fed. Trade Comm'n, *Six steps toward more secure cloud computing* (June 15, 2020), https://www.ftc.gov/business-guidance/blog/2020/06/six-steps-toward-more-secure-cloud-computing (last accessed Feb. 20, 2025).

[19] Fed. Trade Comm'n, Protecting Personal Information: A Guide for Business (June 2015), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last accessed Feb. 20, 2025).

[20] Fed. Trade Comm'n, Start With Security: A Guide for Business, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last accessed Feb. 20, 2025).

as they are issued, and automated tools should be used to track which version of software is running and whether updates are available.[21]

62.    The FTC strongly encourages businesses to "[c]heck expert websites (such as www.us-cert.gov) and your software vendors' websites regularly for alerts about new vulnerabilities, and implement policies for installing vendor-approved patches to correct problems."[22]

63.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations. [23]

64.    Defendants were fully aware of their obligation to implement and use reasonable measures to protect the PII and PHI they obtained from Plaintiffs and Class members, but failed to comply with these basic recommendations and guidelines that would have prevented this breach from occurring. Defendants were also aware of the significant repercussions that would result from their failure to make good on those obligations.

65.    Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class members' PII and PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

---

[21] Fed. Trade Comm'n, Protecting Personal Information: A Guide for Business (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last accessed Feb. 20. 2025).

[22] Id.

[23] Fed. Trade Comm'n, Privacy and Security Enforcement, https://www.ftc.gov/news-events/topics/protecting-consumer-privacy-security/privacy-security-enforcement (last accessed Feb. 20, 2025).

1    **G. _Defendants Failed to Comply With Industry Standards_**

2        66.    Several best practices have been identified that, at a minimum, should be
3    implemented by companies in possession of PII and PHI, like Defendants, including
4    but not limited to: educating all employees; strong passwords; multi-layer security,
5    including firewalls, anti-virus, and anti-malware software; encryption, making data
6    unreadable without a key; multifactor authentication; backup data and limiting which
7    employees can access sensitive data. Defendants failed to follow these industry best
8    practices, including a failure to implement multifactor authentication.

9        67.    Other best cybersecurity practices that are standard include installing
10    appropriate malware detection software; monitoring and limiting the network ports;
11    protecting web browsers and email management systems; setting up network systems
12    such as firewalls, switches and routers; monitoring and protection of physical security
13    systems; protection against any possible communication system; training staff
14    regarding critical points. Defendants failed to follow these cybersecurity best
15    practices, including failure to train staff.

16        68.    In addition, to prevent and detect cyber-attacks Defendants could and
17    should have implemented, as recommended by CISA, the following measures:

18    - **Update and patch your computer.** Ensure your applications and operating
19      systems (OSs) have been updated with the latest patches. Vulnerable
20      applications and OSs are the target of most ransom ware attacks ....

21    - **Use caution with links and when entering website addresses.** Be careful
22      when clicking directly on links in emails, even if the sender appears to be
23      someone you know. Attempt to independently verify website addresses (e.g.,
24      contact your organization's helpdesk, search the internet for the sender
25      organization's website or the topic mentioned in the email). Pay attention to the
26      website addresses you click on, as well as those you enter yourself. Malicious
27      website addresses often appear almost identical to legitimate sites, often using

28

a slight variation in spelling or a different domain (e.g., .com instead of .net) ....

- **Open email attachments with caution.** Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe.** Check a website's security to ensure the information you submit is encrypted before you provide it ....

- **Verify email senders.** If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself.** Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs.** Install antivirus software, firewalls, and email filters-and keep them updated-to reduce malicious network traffic....[24]

69.    To prevent cyber-attacks like the one involved here, Defendants also could and should have implemented ISO 27017, an information security framework for organizations using cloud services.

---

[24] *See generally,* CISA Cybersecurity Best Practices, *available at* https://www.cisa.gov/topics/cybersecurity-best-practices (last accessed March 3, 2025).

70.    ISO/IEC 27017 focuses on addressing the data privacy and security requirements for organizations using cloud services. An overview of the standard is as follows:

Overview of ISO/IEC 27017

a. **Scope**: ISO/IEC 27017 provides guidance to cloud service customers on the implementation of information security controls within the context of their use of cloud services. It complements the existing ISO/IEC 27001 standard, which is a broader information security management system (ISMS) standard.

b. **Objectives**: The standard aims to help organizations protect the confidentiality, integrity, and availability of their information in the cloud environment. It provides guidelines for addressing the risks associated with cloud computing and ensures that cloud service customers maintain control over their data.

c. **Data Classification & Handling**: ISO/IEC 27017 emphasizes the importance of classifying data based on its sensitivity and defining appropriate handling and security measures for each classification. It provides guidance on data encryption, access controls, data segregation, and data retention.

d. **Security Responsibilities**: The standard clarifies the division of security responsibilities between the cloud service customer and the cloud service provider. It outlines the areas where the customer retains control and where the provider assumes responsibility. This helps establish clear expectations and accountability for security measures.

e. **Supplier Management**: ISO/IEC 27017 emphasizes the need for cloud service customers to assess the security capabilities of their cloud service providers. It provides guidance on selecting trustworthy providers, establishing contractual agreements, and monitoring the provider's compliance with security requirements.

f. **Incident Management**: The standard addresses incident management processes in the cloud environment. It provides guidance on incident reporting, investigation, and response to ensure timely and effective handling of security incidents.

g. **Continual Improvement**: ISO/IEC 27017 promotes a continual improvement approach to information security in the cloud. It encourages organizations to regularly review and update their security controls, assess emerging risks, and implement necessary improvements.

71.    ISO/IEC 27017 provides guidance on MFA as a security control for cloud service customers. The standard provides, among other things, the following security requirements:

a. **Authentication Requirements**: The standard emphasizes the importance of strong authentication mechanisms for accessing cloud services. It recommends the use of MFA as an effective method to enhance the security of user authentication. MFA requires users to provide multiple forms of identification, such as a password and a unique code or biometric factor, to verify their identity.

b. **Risk Assessment**: ISO/IEC 27017 encourages cloud service customers to conduct a risk assessment to determine the level of authentication controls required based on the sensitivity of the data and the potential impact of unauthorized access. MFA is often recommended for high-risk or sensitive applications or data.

c. **Access Controls**: The standard provides guidance on implementing access controls in the cloud environment. It suggests that MFA should be used as an additional layer of security in conjunction with other access control measures such as strong passwords, role-based access control (RBAC), and least privilege principles.

d. **User Management**: ISO/IEC 27017 highlights the need for effective user management practices in the cloud. It recommends implementing MFA for user accounts with administrative privileges or access to sensitive data. This helps prevent unauthorized access even if the user's password is compromised.

e. **Supplier Management**: The standard advises cloud service customers to assess the authentication capabilities of their cloud service providers. It recommends selecting providers that offer robust MFA options and have appropriate controls in place to protect customer data.

f. **Compliance Monitoring**: ISO/IEC 27017 suggests that organizations should monitor and review the effectiveness of their MFA controls regularly. This includes monitoring user access logs, analyzing authentication success/failure rates, and promptly addressing any security incidents or vulnerabilities related to authentication.

72.    ISO/IEC 27017 helps cloud service customers strengthen their authentication processes, reduce the risk of unauthorized access, and enhance the overall security of their cloud services.

73.    The foregoing frameworks are established and applicable industry standards for data security, and upon information and belief, Defendants failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

**H. <u>Cybercriminals Have and Will Continue to Use Plaintiffs' and Class members' PII and PHI for Nefarious Purposes</u>**

74.    Plaintiffs' and Class members' Private Information is of great value to cybercriminals, and the data stolen in the Data Breach can be used in a variety of ways for criminals to exploit Plaintiffs and the Class members and to profit off their misfortune and stolen information. The cybercriminals' motives for the Data Breach were purely nefarious and malicious in nature: their one goal was to access systems,

including Defendants' systems, in order to obtain valuable PII and PHI to sell on the dark web.

75.    Criminals can and do piece together bits and pieces of compromised personal information for profit, for example by developing "Fullz" packages.[25]

76.    With "Fullz" packages, cyber-criminals can cross-reference two sources of personal information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

77.    Then, this comprehensive dossier can be sold-and then resold in perpetuity-to crooked operators and other criminals (like illegal and scam telemarketers).

78.    The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII and PHI is stolen and when it is used.

79.    According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

---

[25] "Fullz" is fraudster-speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm,* Krebs on Sec. (Sep. 18, 2014) https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/ (last accessed Feb. 20, 2025).

[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[26]

80.     That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, and to take over victims' identities to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

81.     Plaintiffs and Class members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiffs and Class members are incurring and will continue to incur such damages in addition to any fraudulent use of their PII and PHI.

82.     Furthermore, Plaintiffs and Class members face a substantial risk of future spam, phishing, or other attacks designed to trick them into sharing sensitive

---

[26] U.S. Gov't Accountability Office, Report to Congressional Requesters, Personal Information, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf (last accessed Feb. 20, 2025).

data, downloading malware, or otherwise exposing themselves to cybercrime, where their names, cellular data, and contact information were acquired in the Data Breach. The substantial risk of future exploitation created by the Data Breach constitutes a redressable injury traceable to Defendants' conduct.

83.    PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements.  It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.  PHI can sell for as much as $363 on the black market.[27]

84.    Medical identify theft can result in inaccuracies in medical records and costly false claims.  It can also have life-threatening consequences.  If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment.  "'Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery,'" reported Pam Dixon, executive director of World Privacy Forum.  "'Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities.'"[28]

85.    Similarly, the FBI Cyber Division, in an April 8, 2014 Private Industry Notification, advised:

> Cyber criminals are selling [medical] information on the black market at a rate of $50 for each partial EHR, compared to $1 for a stolen social security number or credit card number.  EHR can then be used to file fraudulent insurance claims, obtain prescription medication, and advance identity theft.

---

[27] *Data Breaches: In the Healthcare Sector,* Ctr. for Internet Sec., https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last accessed Feb. 20, 2025).

[28] Michael Ollove, *The Rise of Medical Identity Theft in Healthcare*, Kaiser Health News (Feb. 7, 2014), https://khn.org/news/rise-of-indentity-theft/ (last accessed Feb. 20, 2025).

EHR theft is also more difficult to detect, taking almost twice as long as normal identity theft.[29]

86.    The ramifications of Defendants' failures to keep Plaintiffs' and Class Members' Private Information secure are long lasting and severe.  Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.  Fraudulent activity might not show up for six to 12 months or even longer.

87.    Further, criminals often trade stolen Private Information on the "cyber black-market" for years following a breach.  Cybercriminals can post stolen Private Information on the internet, thereby making such information publicly available.

## I.    _Defendants Owed a Duty to Plaintiffs and Class members to Keep Their PII and PHI Secure and Protect It From Being Compromised, Lost, Stolen, Accessed, or Misused_

88.    In addition to their obligations under state and federal laws and regulations, Defendants owed a common law duty to Plaintiffs and Class members to protect PII and PHI entrusted to it, including to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII and PHI in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized parties. This duty extends to Defendants' obligations to safeguard PII and PHI shared with subcontractors and service vendors who received PII and PHI from Defendant, and to conduct ongoing, robust due diligence into such subcontractors and service vendors prior to contracting and throughout any relationship.

89.    Defendants further owed and breached their duties to Plaintiffs and Class members to implement processes and specifications that would detect a breach of

---

[29] _Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain_, FBI CYBER DIV. (Apr. 8, 2014), https://info.publicintelligence.net/FBI-HealthCareCyberIntrusions.pdf (last accessed Feb. 20, 2025).

Defendants' security systems in a timely manner and to timely act upon warnings and alerts, including those generated by Defendants' own security systems. Instead of implementing such processes and specifications, Defendants allowed the Data Breach to go undetected for months (and possibly years) before recognizing unusual activity.

90.    As a direct result of Defendants' intentional, willful, reckless, and negligent conduct which resulted in the Data Breach, cyber attackers were able to access, acquire, view, publicize, and/or otherwise cause the theft and misuse to Plaintiffs' and Class members' PII and PHI as detailed above, and Plaintiffs are now at a heightened and ongoing risk of identity theft and fraud.

91.    The Data Breach was a direct and proximate result of Defendants' failure to: (a) properly safeguard and protect Plaintiffs' and Class members' PII and PHI from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' and Class members' PII and PHI; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

92.    Defendants had the resources necessary to prevent the Data Breach, but neglected to adequately implement data security measures, despite their obligation to protect Plaintiffs' and Class members' data, including their PII and PHI.

93.    Had Defendants remedied the deficiencies in Defendants' data security systems and adopted security measures recommended by experts in the field, it would have prevented the intrusions into their systems and, ultimately, the theft of Plaintiffs' and Class members' PII and PHI.

94.    Instead of implementing these basic safeguards that companies entrusted with the sensitive data of millions of children have a duty to provide, PowerSchool failed at multiple levels to protect students.

95.    PowerSchool failed to adopt, implement, and maintain adequate security measures to safeguard Plaintiffs' and Class Members' Private Information from unauthorized access, use, and disclosure.

96.    PowerSchool failed to adequately monitor, audit, and test its systems and networks for vulnerabilities and breaches.

97.    PowerSchool failed to encrypt, redact, or otherwise protect Plaintiffs' and Class Members' Private Information from unauthorized access and misuse.

98.    PowerSchool failed to timely detect and respond to the Data Breach and prevent further unauthorized access and exfiltration of Plaintiffs' and Class Members' Private Information.

99.    PowerSchool failed to timely and accurately notify Plaintiffs and Class Members of the Data Breach and the extent of the compromise of their Private Information.

100.    PowerSchool failed to comply with industry standards and best practices for data security and privacy, as well as applicable laws and regulations, such as the FTC Act and the CCPA.

101.    PowerSchool failed to honor its own representations and promises regarding the protection and confidentiality of Plaintiffs' and Class Members' Private Information.

102.    PowerSchool's failure to protect Plaintiffs' and Class Members' Private Information was the direct and proximate cause of the Data Breach and the resulting harm to Plaintiffs and Class Members.

**J.    _Allegations relating to Andrew Cook and His Children_**

103.    On or about January 10, 2025, Mr. Cook received the following email from his minor children's school system, which reads in its entirety as follows:

> Dear [School District] Families,
> PowerSchool, our district's Student Information System provider, has informed us of a data breach in their system. This incident has affected districts they serve nationwide, including many in Ohio. PowerSchool has indicated it

became aware of the breach on December 28, however, it did not notify impacted districts like ours until the middle of this week. According to PowerSchool, the breach is now contained, the information taken was never published or made public, and the stolen information has been destroyed by the threat actors.

Solon Schools takes the security and privacy of all data seriously, whether it's managed by PowerSchool or other vendors. Upon receiving the notification from PowerSchool, we began investigating the potential information accessed so we could share as much information with you as possible.

We have determined that the following information, to the extent it exists in your child's files, may have been accessed on or about December 22, 2024, by the threat actors:
• Name
• Address
• Date of birth
• Medical alert information (i.e. nurse's notes)
• User name
• Registration date
• First date of attendance
• Primary care physician name

The district has taken all action as required by the Family Educational Rights and Privacy Act ("FERPA") and other applicable laws in response to this unauthorized access.

This incident was limited to PowerSchool's systems, and the unauthorized access occurred through PowerSchool's support portal, not through any district technology or systems.

Thank you for your continued support.

## K. *Plaintiffs' and Class Members' Injuries*

104. Plaintiffs, Class Members, and their parents and guardians entrusted their Private Information to PowerSchool, relying on PowerSchool's representations and promises to protect and safeguard their data from unauthorized access and disclosure.

105. Plaintiffs' and Class Members' parents and guardians reasonably expected that PowerSchool would use reasonable and appropriate security measures to protect Private Information, in accordance with industry standards, best practices, and applicable laws and regulations.

106. Plaintiffs and Class Members, as well as their parents and guardians, also reasonably expected that PowerSchool would timely and accurately notify them of

any breach or compromise of their Private Information, and provide them with adequate information and assistance to mitigate the potential harm.

107.    As a result of PowerSchool's failure to fulfill its obligations and duties, Plaintiffs and Class Members, through their parents and guardians, have suffered and will continue to suffer injuries, including but not limited to:

  a. The loss of the opportunity to control how their Private Information is used;

  b. The compromise, publication, and/or theft of their Private Information;

  c. Out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information;

  d. Lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft, tax fraud, and/or unauthorized use of their Private Information;

  e. The continued risk to their Private Information, which remains in PowerSchool's possession and is subject to further unauthorized disclosures so long as PowerSchool fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession;

  f. Future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and the Class.

## **CLASS ACTION ALLEGATIONS**

108.   Mr. Cook brings this action on behalf of his minor children and all others similarly situated as members of the proposed Class pursuant to Rule 23 of the Federal Rules of Civil Procedure.

109.   Plaintiffs seek to represent the following Class:

**All persons in the United States whose PII and/or PHI was compromised in the Data Breach that occurred between December 19, 2024 and December 24, 2024.**

110.   Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class are any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

111.   Plaintiffs reserve the right to amend or modify the Class definition with greater specificity or division after having had an opportunity to conduct discovery.

112.   Numerosity: The members of the Class are so numerous that their individual joinder is impracticable. Plaintiffs are informed and believes that the Data Breach affected over 60 million individuals in the United States. The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail, email, Internet postings, and/or publication.

113.   Commonality and Predominance: There are numerous questions of law and fact common to Plaintiffs and the Class that predominate over any questions affecting only individual Class members. These common questions include, but are not limited to, the following:

a.   Whether PowerSchool owed a duty of care to Plaintiffs and Class members to protect their Private Information;

b.  Whether PowerSchool breached its duty of care to Plaintiffs and Class members by failing to implement and maintain reasonable security measures to safeguard their Private Information;

c.  Whether PowerSchool breached its duty of care to Plaintiffs and Class members by failing to timely and accurately notify them of the Data Breach and the extent of the compromise of their Private Information;

d.  Whether PowerSchool violated the FTC Act by engaging in unfair or deceptive acts or practices in relation to the collection, storage, and protection of Plaintiffs' and Class members' Private Information;

e.  Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive relief, or other remedies as a result of PowerSchool's conduct.

114.   Typicality: Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs, like all Class members, had their Private Information compromised in the Data Breach. Plaintiffs and the Class were injured through the uniform misconduct of PowerSchool, as described herein, and assert the same claims for relief.

115.   Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs' parent has retained counsel who are competent and experienced in class action and complex litigation, particularly those involving data breaches. Plaintiffs have no interests that are antagonistic to, or in conflict with, the interests of the Class.

116.   Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class members would likely find the cost of litigating their individual claims prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual

Class members, which would establish incompatible standards of conduct for PowerSchool. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

117.    Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Negligence

### *(On Behalf of Plaintiffs and the Class)*

118.    Plaintiffs incorporate and realleges the foregoing allegations as if fully set forth herein.

119.    PowerSchool collected and stored Plaintiffs' and Class members' personal information, including addresses, Social Security numbers, dates of birth, health insurance information, and personal health information including disabilities, immunization records, and medications.

120.    PowerSchool owed Plaintiffs and Class members a duty of reasonable care to preserve and protect the confidentiality of their personal information that it collected. This duty included, among other obligations, maintaining and testing its security systems and networks, and the systems and networks of its vendors, as well as taking other reasonable security measures to safeguard and adequately secure the personal information of Plaintiffs and the Class from unauthorized access and use.

121.    PowerSchool's duties also arise by operation of statute. Pursuant to the FTC Act, 15 U.S.C. § 45, PowerSchool had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class members' PHI and PII.

122. Plaintiffs and Class members were the foreseeable victims of PowerSchool's inadequate and ineffectual cybersecurity systems and protocols. The natural and probable consequence of PowerSchool's failing to adequately secure its information networks was Plaintiffs' and Class members' personal information being hacked.

123. PowerSchool knew or should have known that Plaintiffs' and Class members' personal information was an attractive target for cyber thieves, particularly in light of data breaches experienced by other entities around the United States. Moreover, the harm to Plaintiffs and Class members from exposure of their highly confidential personal information was reasonably foreseeable to PowerSchool.

124. PowerSchool had the ability to sufficiently guard against data breaches by monitoring and testing its systems and implementing adequate measures to protect its systems, such as using attack surface software.

125. PowerSchool breached its duty of care to Plaintiffs and Class members by failing to implement and maintain reasonable security measures to safeguard their personal information from unauthorized access, use, and disclosure.

126. PowerSchool also breached its duty of care to Plaintiffs and Class members by failing to timely and accurately notify them of the Data Breach and the extent of the compromise of their personal information.

127. PowerSchool's failure to protect Plaintiffs' and Class members' personal information was the direct and proximate cause of the Data Breach and the resulting harm to Plaintiffs and Class members.

128. As a direct and proximate result of PowerSchool's negligence, Plaintiffs and Class members have suffered and will continue to suffer injuries, including but not limited to:

     a. The loss of the opportunity to control how their personal information is used;

     b. The compromise, publication, and/or theft of their personal information;

c.  Out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their personal information;

d.  Lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft, tax fraud, and/or unauthorized use of their personal information; and

e.  The continued risk to their personal information, which remains in PowerSchool's possession and is subject to further unauthorized disclosures so long as PowerSchool fails to undertake appropriate and adequate measures to protect the personal information in its continued possession.

129.  Damages and other remedies, including injunctive and declaratory relief, would be appropriate to compensate Plaintiffs for their injuries.

## SECOND CAUSE OF ACTION

### Negligence Per Se

*(On Behalf of Plaintiffs and the Class)*

130.  Plaintiffs incorporate and reallege the foregoing allegations in paragraphs 1 through 117 as if fully set forth herein.

131.  Under the FTC Act, 15 U.S.C. § 45, PowerSchool had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class members' PHI and PII.

132.  PowerSchool violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein.

133.   PowerSchool's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of a data breach involving PII of its consumers.

134.   Plaintiffs and Class members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

135.   The harm that has occurred as a result of PowerSchool's conduct is the type of harm that the FTC Act was intended to guard against.

136.   As a direct and proximate result of PowerSchool's negligence per se, Plaintiffs and Class members have suffered and will continue to suffer injuries, including but not limited to those described herein.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class set forth herein, respectfully requests the following relief:

A.      That the Court certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiffs are the proper class representative; and appoint Plaintiffs' counsel as Class Counsel;

B.      That the Court grant permanent injunctive relief to prohibit and prevent Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein;

C.      That the Court award Plaintiffs and Class Members compensatory, consequential, and general damages, including nominal damages as appropriate, for each count as allowed by law in an amount to be determined at trial;

D.      That the Court award trebled and/or punitive or exemplary damages, to the extent permitted by law;

E.      That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of their unlawful acts, omissions, and practices;

F.     That Plaintiffs be granted the declaratory and injunctive relief sought herein;

G.     That the Court award to Plaintiffs the cost and disbursements of the actions, along with reasonable attorneys' fees, costs, and expenses; and

H.     That the Court award pre- and post-judgement interest at the maximum legal rate and all such other relief as it deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial in the instant action.


Dated: March 3, 2025                    Respectfully submitted,

                                        */s/     Brian O. O'Mara*
                                        Brian O. O'Mara

                                        **DiCELLO LEVITT LLP**
                                        Brian O. O'Mara (229737)
                                        Steven M. Jodlowski (239074)
                                        4747 Executive Drive, Suite 240
                                        San Diego, CA 92121
                                        Tel.: (312) 214-7900
                                        briano@dicellolevitt.com
                                        stevenj@dicellolevitt.com

                                        Amy E. Keller (IL-6296902, MI-P74015 *pro hac vice* forthcoming)
                                        Nada Djordjevic (IL-6277380 *pro hac vice* forthcoming)
                                        Madeline Hills (IL-6345829, MO-76029, WI-1122794 *pro hac vice* forthcoming)
                                        Ten North Dearborn St., Sixth Floor
                                        Chicago, Illinois 60602
                                        Tel.: (312) 214-7900
                                        akeller@dicellolevitt.com
                                        ndjordjevic@dicellolevitt.com

                                        Corban S. Rhodes (NY-4559183 *pro hac vice* forthcoming)
                                        485 Lexington Ave, Suite 1001
                                        New York, NY 10017
                                        Tel.: (312) 214-7900
                                        crhodes@dicellolevitt.com

CLASS ACTION COMPLAINT
-36-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Counsel for Plaintiffs and the Proposed Class*